**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (D.C. Bar # 100019) (seeking *pro hac vice admission*)
Email:  lmasri@cair.com
Gadeir I. Abbas* (VA Bar # 81161) (seeking *pro hac vice admission*)
Email:  gabbas@cair.com
Carolyn M. Homer (D.C. Bar # 1049145) (seeking *pro hac vice admission*)
Email: chomer@cair.com
453 New Jersey Ave., SE
Washington, DC 20003
Phone: (202) 742-6420
Fax:     (202) 379-3317

**KELLY / WARNER, PLLC**
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Raeesabbas Mohamed, Esq. (AZ Bar # 027418)
Email: raees@kellywarnerlaw.com
Phone: (480) 331-9397
Fax:     (866) 961-4984

*Attorneys for Plaintiffs*

   * Licensed in VA, not in D.C.
   Practice limited to federal matters

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| AMERICAN MUSLIMS FOR PALESTINE and DR. HATEM BAZIAN <br><br> Plaintiffs, <br><br> vs. <br><br> ARIZONA STATE UNIVERSITY; ARIZONA BOARD OF REGENTS; and MARK BRNOVICH, in his official capacity as Attorney General of Arizona <br><br> Defendants. | Case No.  CV-18-670-PHX-JJT <br><br> MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................1

   A.  The Political Climate Surrounding the Peaceful Palestinian Boycott, Divestment and Sanctions Movement ...............................................................................................1

   B.  Arizona Passes Anti-Boycott, Divestment, and Sanctions Legislation Requiring Government Contracts to Ban Support for Boycotts of Israel .......................................2

   C.  The Muslim Students Association of Arizona State University Invites Pro-Palestine Speakers to April 3, 2018 Campus Event ......................................................3

ARGUMENT ........................................................................................................................5

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS THAT ARIZONA'S ANTI-BDS ACT VIOLATES THE FIRST AMENDMENT ...................................................................6

   A.  Participation in Consumer Boycotts Constitutes Protected Speech and Expressive Conduct ..................................................................................................6

   B.  Because Arizona State University Offers a Limited Public Forum for Student Activities, It Cannot Discriminate Against BDS Viewpoints ......................................7

   C.  Arizona's anti-BDS Act Targets Specific Content and Speakers ...........................9

   D.  Arizona's anti-BDS Act and "No Boycott of Israel" Clause Run Afoul of other First Amendment Doctrines ....................................................................................10

   E.  Arizona's anti-BDS Act and "No Boycott of Israel" Clause are not Narrowly Tailored to Fulfill Compelling Governmental Interests ...............................................13

III.  THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH IN FAVOR OF ENJOINING ENFORCEMENT OF THE ANTI-BDS LAW AND "NO BOYCOTT OF ISRAEL" CLAUSE ...........................................................................................................................14

CONCLUSION ..................................................................................................................16

RELIEF REQUESTED ......................................................................................................16

APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.,*
    133 S. Ct. 2321 (2013) ........................................................................... 11

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .......................................................... 6, 15

*Arc of California v. Douglas,*
    757 F.3d 975 (9th Cir. 2014) ............................................................ 5, 14

*Boos v. Barry,*
    485 U.S. 312 (1988) .................................................................................. 9

*Coates v. Cincinnati,*
    402 U.S. 611 (1971) ............................................................................... 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................... 14

*Farris v. Seabrook,*
    677 F.3d 858 (9th Cir. 2012) ............................................................... 15

*Forsyth 4 County, Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................... 10

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2008) ............................................................. 15

*Koontz v. Watson,*
    No. 17-cv-4099, 2018 U.S. Dist. LEXIS 14260 (D. Kan. Jan. 30, 2018) ........ 1, 7, 10, 11

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993). ........................................................................... 7, 8

*M.R. v. Dreyfus,*
    697 F.3d 706 (9th Cir. 2012) ............................................................ 6, 15

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ............................................................................ 6, 7

*O'Hare Truck Serv. v. City of Northlake,*
    518 U.S. 712 (1996) ............................................................................... 11

*Police Dep't of City of Chicago v. Mosley,*
    408 U.S. 92 (1972) .................................................................................. 8

*Planned Parenthood Arizona, Inc. v. Humble,*
    753 F.3d 905 (9th Cir. 2014) ............................................................... 15

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ........................................................... 6, 10, 13, 14

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995). ............................................................. 6, 7, 8, 9

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ............................................... 15

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ................................................. 14

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .................................................................. 9

**Constitution & Statutes**

U.S. CONST. Amend. I ...................................................... *passim*

Ariz. Rev. Stat. § 35-393 *et seq.* .................................... *passim*

**Other Authorities**

2016 Ariz. HB 2617 § 2 (Mar. 17, 2016) ...................... 10

Boston Non-Importation Agreement (Aug. 1, 1768) ........ 6

*Induce*, OXFORD LIVING DICTIONARIES ....................... 12

*U.N. Resolution 2334*, UNITED NATIONS SECURITY COUNCIL (Dec. 23, 2016) .............. 1, 2

**INTRODUCTION**

The State of Arizona cannot impose viewpoint-discriminatory conditions on either government contracts or campus speech.  In 2016, Arizona enacted Ariz. Rev. Stat. § 35-393 *et seq.*, a law aimed at discouraging Palestinian activism within the state by prohibiting government contractors from engaging in boycotts of Israel.  Pursuant to that law, the Arizona Board of Regent's contract regarding presentations at Arizona State University now requires speakers to certify that they do not boycott Israel.  Plaintiffs American Muslims for Palestine and Dr. Hatem Bazian, the invited speakers for an April 3, 2018 educational event hosted by the Muslim Students Association at Arizona State University, cannot assent to such a provision.  Plaintiffs now bring this action to enjoin enforcement of the Act as an unconstitutional trespass on fundamental First Amendment protections.

The District of Kansas recently enjoined enforcement of a substantively identical Kansas law.  *Koontz v. Watson*, No. 17-cv-4099, 2018 U.S. Dist. LEXIS 14260 (D. Kan. Jan. 30, 2018).  The Distract of Kansas found that those who band together through boycotts to express dissatisfaction with the Palestinian plight "seek to amplify their voices to influence change" and "are engaged in protected activity."  *Id.* at *24.  This Court should reach the same result.  Arizona's ban on state contractors who boycott Israel must be enjoined as inconsistent with the First Amendment, thereby permitting Plaintiffs' April 3, 2018 presentation at Arizona State University to proceed.

**FACTUAL BACKGROUND**

### A.    The Political Climate Surrounding the Peaceful Palestinian Boycott, Divestment and Sanctions Movement

The conflict between Israel and Palestine is an internationally significant political conflict.  *See* Declaration of Dr. Hatem Bazian ¶ 4.  One of the core disputes within the conflict concerns Israeli occupation and political control over Palestinian territory, including the West Bank and Golan Heights.  *Id.*

On December 23, 2016, the United Nations Security Council unanimously (with the United States abstaining) adopted U.N. Resolution 2334 (the "Resolution").  Bazian Decl. ¶ 5, Ex. A.  The Resolution condemned Israeli settlements in Palestinian territory, and reaffirmed that continuing settlements "constitute[e] a flagrant violation under international law and a major obstacle to the achievement of the two-State solution and a just, lasting and comprehensive peace." *Id.*  The United States abstained from the vote because it is a close political, economic, and military ally of Israel. *Id.* ¶ 5.  Although official United States policy is to discourage Israeli settlements in Palestinian territory, the United States has not historically taken formal action to advance that position. *Id.*

The merits of all perspectives on the Israel-Palestine conflict and the U.S.'s political actions related to it are robustly and publicly debated by leading politicians, academics, universities, non-profit organizations, businesses, and media pundits in the United States and around the world. *Id.* ¶ 6.  In support of the Palestinian perspective on this conflict, the international "BDS" movement calls for "Boycott, Divestment, and Sanctions" of Israeli activity which does not comport with international law. *Id.* ¶¶ 7-8.  The BDS movement began on July 9, 2005, and identifies three specific goals for its activism: (1) End Israeli occupation and settlement in Palestinian lands; (2) Recognize Palestinians living in Israel as full citizens with equal fundamental rights; and (3) Provide Palestinian refugees with a right of return to their homes. *Id.* ¶ 7.  Forms of BDS activism to achieve those goals vary, and are neither centrally directed nor controlled.  Bazian Decl. ¶ 8; Declaration of Taher Herzallah ¶¶ 3-5.

**B.    Arizona Passes Anti-Boycott, Divestment, and Sanctions Legislation Requiring Government Contracts to Ban Support for Boycotts of Israel**

In recent years, public officials throughout the United States have called for and advanced measures to discourage Boycott, Divestment, and Sanctions activity within the United States.  On March 17, 2016, Arizona enacted HB 2617, codified at Ariz. Rev. Stat. § 35-393 *et seq.* (the "Act").  Ariz. Rev. Stat. § 35-393.01 provides: "A public entity may not enter into a contract with a company to acquire or dispose of services, supplies,

information technology or construction unless the contract includes a written certification that the company is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel." The Act defines "Boycott" to include "engaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with Israel." Ariz. Rev. Stat. § 35-393.

In support of the Act, the Arizona legislature found that "Boycotts and related tactics have become a tool of economic warfare that threaten the sovereignty and security of key allies and trade partners of the United States," particularly Israel. 2016 Ariz. HB 2617 § 2(A) (Legislative Findings). The legislature then concluded that "a company's decision to discriminate against Israel, Israeli entities or entities that do business with Israel or in Israel is an unsound business practice making the company an unduly risky contracting partner." *Id.* § 2(E). The complete Act is appended to this memorandum.

Based on the Act, the Arizona Board of Regents and Arizona State University have inserted "No Boycott of Israel" language into their standard contracts. In particular, Paragraph 20 of the "Speaker/Artist/Performer Agreement" now reads: "No Boycott of Israel. As required by Arizona Revised Statutes § 35-393.01, Entity certifies it is not currently engaged in a boycott of Israel and will not engage in a boycott of Israel during the term of this Contract." Bazian Decl. ¶¶ 12-14, Ex. B; Herzallah Decl. ¶¶ 7-8, Ex. A.

### C.   The Muslim Students Association of Arizona State University Invites Pro-Palestine Speakers to April 3, 2018 Campus Event

Arizona State University is a robust research institution with multiple programs engaged in research and dialogue on political and religious conflict in the Middle East. These programs include ASU's School of Politics and Global Studies; School of Historical, Philosophical, and Religious Studies; Department of Jewish Studies; Council for Arabic and Islamic Studies; Center for the Study of Religion and Conflict; and Center for Strategic Communication. *See* Declaration of Gadeir Abbas ¶ 4, Ex. C (landing pages of ASU programs).

Arizona State University also provides an open venue for its diverse student body to organize into groups and host educational events.  *See* Abbas Decl. ¶ 2, Ex. A (Arizona State University Student Organization Handbook).  ASU promotes the ease by which "any student can take the initiative to create a new student organization" (*id.* at 2), reserve physical facilities for student events (*id.* at 8-11), and "make friends with those who have similar interests as well as learn about, understand and appreciate other cultures, identities and perspectives" (*id.* at 2).  Moreover, ASU's policy on academic freedom states "The pursuit and communication of knowledge at ASU are to be free from restrictions and include respect for … the right of all to attempt to persuade by reasoned argument or peaceful processes."  *See* Abbas Decl. ¶ 3, Ex. B (ASU Academic Affairs Manual § 201).

ASU student organizations with interests in Middle East politics include the Muslim Students Association, Students for Justice in Palestine, and Students Supporting Israel.  *See* Abbas Decl. ¶ 5, Ex. D (excerpts of ASU's searchable student organization portal).  These and other student groups regularly host educational events on campus, and invite guest speakers.  *See* Abbas Decl. ¶¶ 6-8, Ex. E-G (public pages for past Muslim Students Association, Students for Justice in Palestine, and Hillel Jewish Student Center events).  In particular, the Muslim Students Association at Arizona State University promotes interfaith and intellectual dialogue by inviting Muslim members of the community to offer their perspectives on American life and international conflict.  *See* Abbas Decl. ¶ 6, Ex. E.

For a student organization to obtain formal approval to host an event, the Arizona Board of Regents and Arizona State University require some basic paperwork, like pre-clearing the availability of physical facilities.  *See* Abbas Decl. ¶ 2, Ex. A at 8 ("Events and Space Reservations").  Invited outside speakers must also sign the University's boilerplate "Speaker/Artist/Performer Agreement."  Bazian Decl. ¶¶ 12-14, Ex. B; Herzallah Decl. ¶¶ 6-8, Ex. A.  At some point following passage of Ariz. Rev. Stat. § 35-393 in March 2016, the Arizona Board of Regents and Arizona State University inserted the "No Boycott of Israel" clause into their standard speaker agreement.

On February 22, 2018, the leadership of the Muslim Students Association invited American Muslims for Palestine and Dr. Hatem Bazian to present on the BDS movement at an April 3, 2018 campus event, and attached the "Speaker/Artist/Performer Agreement." Bazian Decl. ¶ 12; Herzallah Decl. ¶¶ 6-7. Both American Muslims for Palestine and Dr. Hatem Bazian actively engage in, and advocate for, boycotts of Israel due to Israel's continuing violations of international law in its treatment of Palestinians. Bazian Decl. ¶ 14; Herzallah Decl. ¶ 8. American Muslims for Palestine has long been at the forefront of the BDS movement. Herzallah Decl. ¶¶ 3-5. American Muslims for Palestine has spearheaded BDS activism in the United States, such as a BDS campaign against SodaStream. Herzallah Decl. ¶ 4. SodaStream is an Israeli company which used to operate a factory in the West Bank; in October 2014, and in response to the boycott, SodaStream announced it would close the factory. *Id.*

Dr. Bazian and American Muslims for Palestine would like to accept the Muslim Students Association's invitation and present on the peaceful Boycott, Divestment, and Sanctions movement on April 3, 2018. Bazian Decl. ¶ 12; Herzallah Decl. ¶ 6. However, neither Dr. Bazian nor American Muslims for Palestine will sign the contract with the "No Boycott of Israel" provision, which is required by Arizona state law. Bazian Decl. ¶ 14; Herzallah Decl. ¶ 8. As advocates for Palestinian rights and justice, they cannot in good faith state that they do not boycott Israel, and will not advocate for the boycott of Israel. *Id.* The "No Boycott of Israel" clause in ASU's standard speaker agreement is, to Plaintiffs' knowledge, the only institutional and legal roadblock to their participation in the scheduled April 3, 2018 event. Bazian Decl. ¶ 16; Herzallah Decl. ¶ 8.

### ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citation omitted). The Ninth Circuit uses a "sliding scale approach to preliminary

- 5 -

injunctions," under which a preliminary injunction should issue "where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (formatting and citation omitted); *accord M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS THAT ARIZONA'S ANTI-BDS ACT VIOLATES THE FIRST AMENDMENT

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. Amend. I.  The First Amendment equally binds the State of Arizona through the incorporation doctrine of the Fourteenth Amendment.  *See, e.g.*, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 822 (1995).  State governments have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

### A.   Participation in Consumer Boycotts Constitutes Protected Speech and Expressive Conduct

The founding story of America, taught every year to elementary school students nationwide, begins with colonial boycotts to protest British taxes.  *See, e.g.*, Boston Non-Importation Agreement (Aug. 1, 1768).   Boycotts have served critical expressive purposes at other times in American history.  During the Civil Rights Moment of the 1960s, black citizens in Mississippi "presented white elected officials with a list of particular demands for racial equality and integration."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982).  When those demands were not satisfied, the National Association for the Advancement of Colored Peoples called for a complete boycott of the area's white merchants.  *Id.*  "The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join in its cause." *Id.* at 907.

The Supreme Court in *Claiborne* recognized that all (non-violent) aspects of the NAACP boycott constituted "form[s] of speech or conduct that [are] ordinarily entitled to protection under the First and Fourteenth Amendments."  *Id.* at 907, 915.  It held that a

- 6 -

State's "broad power to regulate economic activity" simply does not extend to "prohibit[ing] peaceful political activity such as that found in [a] boycott" which expresses concern on critical public issues and showcases a desire for self-government. *Id.* at 913.  Such activity "rest[s] on the highest rung of the hierarchy of First Amendment values."  *Id.* (internal citation omitted).

BDS boycotts are fully protected expressive activity under the First Amendment. American Muslims for Palestine and Dr. Bazian have "banded together" with the global Boycott, Divestment and Sanctions movement in order "to express, collectively, their dissatisfaction with Israel and to influence governmental action…[They] and others participating in this boycott of Israel seek to amplify their voices to influence change, as did the boycotters in *Claiborne*."  *Koontz v. Watson,* No. 17-cv-4099, 2018 U.S. Dist. LEXIS 14260, at *24 (D. Kan. Jan. 30, 2018) (enjoining similar anti-BDS law in Kansas).

### B. Because Arizona State University Offers a Limited Public Forum for Student Activities, It Cannot Discriminate Against BDS Viewpoints

Public universities which permit a wide range of educational activities by a wide range of student organizations provide limited public forums for speech.  *Rosenberger*, 515 U.S. at 829.  "Viewpoint discrimination … is presumed impermissible when directed against speech otherwise within the forum's limitations."  *Id.* at 830.  Any "ideologically driven attempts to suppress a particular point of view" within a limited public forum "are presumptively unconstitutional."  *Id.* at 830.

In Arizona, the general "subject matter" of Middle East conflict "is not one that the [school] has placed off limits to any and all speakers."  *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993).  Rather, ASU sponsors at least a half-dozen academic programs related to the internationally important subjects of Israel and Palestine.  *See* Abbas Decl. ¶ 4, Ex. C.  ASU has also granted official recognition to student organizations representing both Israeli and Palestinian perspectives, including "Students Supporting Israel" and "Students for Justice in Palestine."  *See* Abbas Decl. ¶ 5, Ex. D at 10.  ASU has permitted student organizations to present both pro-Palestinian and

pro-Israeli messages in the past.  *See* Abbas Decl. ¶¶ 7-8, Exs. F-G (student event pages

for "Israeli Apartheid Week" and "ASU Israel Day").  Both Dr. Bazian and Mr. Herzallah

of American Muslims for Palestine have previously visited ASU to offer messages on the

Israel – Palestine conflict.  Bazian Decl. ¶ 11; Herzallah Decl. ¶¶ 9-10.

According to ASU's policies and commitments to diversity and dialogue, all such

educational events on Israel and Palestine *should* still be permitted on campus.  *See* Abbas

Decl. ¶¶ 2-3, Exs. A-B (ASU policies on student organizations and academic freedom).

But Defendants' enforcement of Ariz. Rev. Stat. § 35-393 and imposition of a "No

Boycott of Israel" contractual clause now presents a viewpoint-based hindrance to those

activities.  Although, in theory, classroom and student event discussion of the Boycott,

Divestment, and Sanctions movement is permitted, the ASU community is now deprived

of hearing from actual experts and participants in that movement.  *See* Bazian Decl. ¶¶ 2-

14; Herzallah Decl. ¶¶ 2-5, 8.

The viewpoint-discrimination purpose of Arizona's "No Boycott of Israel" clause

is apparent by what the contract does *not* prohibit.  ASU's form contract and policies raise

no hindrance to a student group sponsoring an educational discussion on Israeli

settlements in the West Bank, so long as the speakers were neutral or identified as pro-

Israeli.  It is only pro-Palestinian participants in the BDS movement who are barred from

speaking.  *See* Bazian Decl., Ex. B; Herzallah Decl., Ex. A (identical copies of

Speaker/Artist/Performer Agreement including ¶ 20).

There is thus no indication that Plaintiffs are unable to speak at the April 3, 2018

Muslim Students Associations event "other than the fact that the presentation would have

been from a [Palestinian] perspective."  *See Lamb's Chapel*, 508 U.S. at 393-394.

"Denial on that basis [is] plainly invalid" viewpoint discrimination.  *Id.* at 394; *accord*

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (Illinois statute

distinguishing between labor and anti-labor protestors failed strict scrutiny because the

First Amendment condemns "discrimination among different users of the same medium

for expression").   Because viewpoint-based discrimination is the most "blatant" and

- 8 -

"egregious" form of speech discrimination, both the Act and the "No Boycott of Israel" clause must each be enjoined.  *See Rosenberger*, 515 U.S. at 828-29.

### C.    Arizona's anti-BDS Act Targets Specific Content and Speakers

Although viewpoint-based discrimination is the most "egregious" First Amendment violation, content-based and speaker-based restrictions on speech are also presumptively unconstitutional.  *See Rosenberger*, 515 U.S. at 828-29 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys…In the realm of private speech or expression, government regulation may not favor one speaker over another.").

A law or regulation is content-based, and presumptively unconstitutional, if "the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Arizona's anti-BDS Act is content-based because it singles out those who participate in boycotts *against Israel* for disfavored treatment.  *See* Ariz. Rev. Stat. § 35-393 (defining "boycott" as engaging in business or "other actions" that are "intended to limit commercial relations with Israel").  This is akin to the Supreme Court's rejection of a D.C. protest ordinance as unconstitutionally content-based: "Whether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not."  *Boos v. Barry*, 485 U.S. 312, 319 (1988).  Likewise in Arizona, whether invited speakers may speak on campus depends entirely upon whether they engage in a boycott critical *of Israel*, as opposed to any other government, company, or cause.  Only anti-*Israel* content is targeted; such a content distinction fails First Amendment scrutiny.

The Act is also impermissibly speaker-based because it only bars Arizona *contractors* from boycotting Israel, while leaving unregulated all other private speakers in Arizona who boycott Israel.  Arizona residents and businesses who do not contract with the State of Arizona may still boycott Israel, without censure, and regardless of the

- 9 -

economic effects of their actions.  Meanwhile, the Act instructs the State to dedicate resources to "prepar[ing] a list of restricted companies" who the State believes are engaged in boycotts of Israel, and then disseminate that list "on request."  Ariz. Rev. Stat. § 35-393.02(A)-(B).  Arizona is thus singling out a specific set of speakers and labeling them as "unsound" and "unduly risky" solely on the basis of their real or suspected support of Palestine through Israel boycotts.  *See* 2016 Ariz. HB 2617 § 2(E).  It is plain that Arizona's "speaker preference reflects a content preference" – i.e. official state support for Israel – and is therefore invalid.  *See Reed*, 135 S. Ct. at 2230 (internal citations omitted); Bazian Decl. ¶ 15.

The District of Kansas recently agreed that a near-identical statute violated the First Amendment.  Examining comparable legislative history, the court there concluded that Kansas's "goal is to undermine the message of those participating in a boycott of Israel. This is either viewpoint discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment."  *Koontz*, 2018 U.S. Dist. LEXIS 14260 at \*25.  The same analysis governs Arizona's proclaimed intent to prevent "economic warfare" against the "dynamic and innovative" nation of Israel.  Az. Rev. Stat. § 35-393.03.  As a facially viewpoint-based, content-based, and speaker-based restriction on those who support anti-Israel boycotts, the Act must be enjoined.

### D.   Arizona's anti-BDS Act and "No Boycott of Israel" Clause Run Afoul of other First Amendment Doctrines

Arizona's official discrimination against protected advocacy and expression is so egregious, it violates numerous other First Amendment doctrines beyond the viewpoint, content, and speaker restrictions detailed above.  Plaintiffs briefly set forth the basis for each of these violations below.

***Prior Restraint.***  Arizona's anti-BDS Act and "No Boycott of Israel" clause constitute prior restraints on protected First Amendment activity.  The purpose and effect of Arizona's "No Boycott of Israel" provisions is to "weed out disfavored expression

- 10 -

before it occurs" by preemptively limiting government contractors' advocacy and speech. *See Forsyth 4 County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

**Unconstitutional Conditions & Overbreadth.** A state government cannot "coerce support" for its preferred "political association[s] by subjecting government contractors to "direct and specific abridgement[s] of First Amendment rights." *O'Hare Truck Serv. V. City of Northlake*, 518 U.S. 712, 720 (1996). Although "governmental entities make a wide range of decisions in the course of contracting for goods and services," "it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views." *Id.* at 724-26. The anti-BDS Act and the "No Boycott of Israel" clause each impose unconstitutional conditions on government contractors by requiring them to cease their protected political boycotts of Israel in order to engage in utterly unrelated transactions with Arizona. *See Agency for International Development v. Alliance for Open Society International, Inc.,* 133 S. Ct. 2321 (2013) (holding that unconstitutional conditions "seek to leverage [state] funding to regulate speech outside the contours of the program itself"). As the District of Kansas just recognized, Kansas's comparable anti-BDS act is unconstitutional because it "regulates inherently expressive conduct and forces plaintiff to accommodate [the State's political] message." *Koontz*, 2018 U.S. Dist. LEXIS 14260 at *29.

**Vagueness**. Laws are unconstitutionally vague where "men of common intelligence must necessarily guess at [their] meaning." *Coates v. Cincinnati*, 402 U.S. 611. 614 (1971) (internal citation omitted). It is by no means clear what exact activities the State of Arizona intends to prohibit through its anti-Israeli-boycott provisions. Arizona's definition of "boycott" encompasses more than just the conduct of an economic "refusal to deal" with Israel. Ariz. Rev. Stat. § 35-393. The definition also contains a catch-all against "performing other actions that are intended to limit commercial relations with Israel…in compliance with or adherence to calls for a boycott of Israel." *Id.* Such "other actions" pursuant to "calls for a boycott of Israel" could easily encompass pure political advocacy seeking to inform others about the Boycott, Divestment and Sanctions

movement as a step to persuading *others* to economically boycott Israel.  Indeed, a separate section of the Act forbids state entities from adopting any "procurement, investment or other policy that has the effect of inducing … a person … to boycott Israel." Ariz. Rev. Stat. § 35-393.01(B). The standard dictionary definition of "induce" is to "succeed in *persuading* or leading (someone) to do something."  *See Induce*, OXFORD LIVING DICTIONARIES, available at https://en.oxforddictionaries.com/definition/induce (emphasis added).  A reasonable person would view Arizona's prohibitions on "performing other actions that are intended to limit commercial relations with Israel" or "inducing … a person … to boycott Israel" as targeting peaceful Boycott, Divestment, and Sanctions advocacy.

The State has attempted to limit the above "boycott" definition as only encompassing a narrow range of *conduct*: "the boycott must either be directed at the Israeli government itself or at companies solely because they are either located in Israel or do business with/in Israel."  *See Jordahl v. Brnovich*, No. 3:17-cv-08263 (D. Ariz), Dkt. 28 (AZ Opp. Br. to PI) at 8-9.  The State claims that general decisions to not work with specific Israeli companies, or "partial" boycotts of some but not all Israeli economic activity, fall outside the Act's scope.  *See id.*

The State's attempted definition is useless and does not cure the vagueness deficiency.   The State has simultaneously indicated that Plaintiffs' participation in the "Boycott, Divestment, and Sanctions" movement, which "advocate[s] complete or near-complete boycotts of *all* Israeli companies," *is* "squarely addressed" by the Act.  *See Jordahl*, Dkt. 28 at 1, 9.  Arizona specifically identifies the "BDS" movement alongside "anti-Jewish animus" and refusing to conduct business with *all* Israelis, as the Act's intended scope.  *Id.* at 12-13.  These attempted distinctions mean that Arizona might consider a contractor's consumer boycott against the Israeli company SodaStream *alone* to be permissible, whereas a boycott against *all* Israeli companies would be verboten, even if both actions were substantively grounded in the BDS movement and protesting perceived maltreatment of Palestinians.  *See Herzallah Decl. ¶ 4.  The State's

- 12 -

characterizations of the BDS movement are themselves non-sensical: Plaintiffs do not boycott Israeli companies "solely because" they are Israeli, they boycott Israeli companies which support the maltreatment of Palestinians because specific demands for Palestinian justice have not yet been politically met.  *See* Bazian Decl. ¶ 4-11, 14; Herzallah Decl. ¶¶ 3-5, 9.

Arizona's incongruous interpretations of the Act heighten rather than reduce the vagueness problem.  The "BDS" movement is not a monolith with a single agenda, and it welcomes multiple and varied forms of economic protest against Israel.  *See* Bazian Decl. ¶ 8.  The State's attempted fine-toothed distinctions to save the Act provide little comfort to Plaintiffs, or to any potential Arizona contractor presented with simple "No Boycott of Israel" clauses.  The vagueness of § 35-393, *et seq*. and ASU's "No Boycott of Israel" clause operates to chills free speech, expression, and association.  They must be enjoined.

### E.   Arizona's anti-BDS Act and "No Boycott of Israel" Clause are not Narrowly Tailored to Fulfill Compelling Governmental Interests

The multitude of First Amendment ills inflicted by Arizona's anti-BDS Act and "No Boycott of Israel" clause can only be overcome if Arizona satisfies strict scrutiny.  *See, e.g., Reed*, 135 S. Ct. at 2226.  Strict scrutiny requires Arizona to prove that its speech restrictions "are narrowly tailored to serve compelling state interests."  *Id.* Defendants cannot meet that standard.

Although Arizona has elsewhere claimed a compelling interest in combatting economic discrimination on the basis of national origin, *Jordahl*, Dkt. 28 at 23-24, this lacks credibility.  The Act does not prohibit all economic boycotts based on national origin, it only prohibits boycotts *against Israel*.  Ariz. Rev. Stat. § 35-393.  Arizona contractors remain free, for example, to economically boycott Palestine – or Syria, Lebanon, Jordan, or Egypt.  Arizona's statutory "Israel" qualification proves that the regulation is not an effective anti-discrimination measure, but rather is impermissibly content-based.

Moreover, if Arizona truly sought to prohibit discrimination based on national origin in the economic activity of the state, it would have extended the prohibition to *all* resident boycotters, not just government contractors.  It is black-letter First Amendment doctrine that a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on [protected] speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed*, 135 S. Ct. at 2232 (internal citations omitted).  Instead of precluding *all* anti-Israel "discrimination," Arizona has taken the opposite approach.  Arizona only prohibits "discrimination" by contractors, and even within those contractors Arizona makes untenable distinctions.  *See, e.g.,* Ariz. Rev. Stat. § 35-393.02(G) ("This section does not apply to investments that are made by the State Treasurer pursuant to Section 35-314.01.")  Arizona's efforts to cabin in and backpedal from the vague and expansive scope of its supposedly vital law cannot write around the Act's facial First Amendment invalidity.

## III.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH IN FAVOR OF ENJOINING ENFORCEMENT OF THE ANTI-BDS LAW AND "NO BOYCOTT OF ISRAEL" CLAUSE

After demonstrating either a likelihood of success on the merits or a serious question going to the merits, the party seeking a preliminary injunction must show that (a) it is likely to suffer irreparable harm in the absence of preliminary relief, (b) the balance of equities tips in his favor, and (c) a preliminary injunction is in the public interest.  *E.g., Arc of California*, 757 F.3d at 983. Because each factor clearly favors Plaintiffs, an injunction against enforcement of the anti-BDS Act and "No Boycott of Israel" clause is appropriate, in order to allow Plaintiffs' participation in the Muslim Students Association's April 3, 2018 educational event to proceed.

*Irreparable Harm.*  The "loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury."  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Plaintiffs are vocal advocates for Palestinian justice who support the Boycott, Divestment, and Sanctions movement.  Bazian Decl. ¶ 14; Herzallah

- 14 -

Decl. ¶ 8.  Pursuant to Arizona law, Plaintiffs are now forbidden from both participating in and advocating for a political cause they believe in, while also signing any contract with the State of Arizona.  It is only because of the Act and the "No Boycott of Israel" clause that Plaintiffs are unable to satisfy ASU's outside speaker requirements for student events. Bazian Decl. ¶ 16; Herzallah Decl. ¶ 8.  Absent relief from this Court, Plaintiffs will be barred from attending the April 3, 2018 event due to their participation in and advocacy for economic boycotts of Israel.  This constitutes irreparable harm, and warrants an injunction declaring the "No Boycott of Israel" clause unenforceable and the Act void.

   *Balance of the Equities*.  The scales of equity sharply tip in favor of upholding fundamental First Amendment values.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2008).  When the balance of equities "tips sharply" in the plaintiff's favor—as it does here—an injunction is proper.  *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012); *Alliance for the Wild Rockies*, 632 F.3d at 1135.

   The balancing of equities must account for the relative imposition of burdens on the parties.  Absent an injunction, Plaintiffs will be unable to exercise their First Amendment rights and speak at an educational event in the near future: on April 3, 2018. By contrast, Defendants will experience no adverse effects from permitting the event to go forward.  Defendants permit a multitude of student events with outside speakers to occur regularly on campus, including on the subjects of Israel and Palestine, and this event is not categorically different.  *See* Abbas Decl. ¶¶ 4-8, Ex. C-G.  A preliminary injunction will simply restore Defendants' campus speaker policy to the pre-2016 *status quo*.  Moreover, Defendants' lone objection to Plaintiffs' presentation is centered around the anti-Israeli viewpoint of the speakers.  The failure to enforce the "No Boycott of Israel" clause cannot impose a constitutionally cognizable burden on Defendants because it is an impermissible basis for distinction in the first place.

   *Public Interest*. There is a "significant public interest in upholding First Amendment principles."  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129 (9th Cir.

- 15 -

2011).  Permitting Plaintiffs to sign Arizona's standard speaker agreement, with the "No Boycott of Israel" clause stricken, serves the "public interest in upholding free speech and association rights," *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012).

## CONCLUSION

The Court should declare Ariz. Rev. Stat. § 35-393 unconstitutional and unenforceable as facially inconsistent with the Free Speech Clause of the First Amendment. The Court should further strike the "No Boycott of Israel" clause from Plaintiffs' contemplated speaker contracts with the Arizona Board of Regents and Arizona State University, thereby permitting them to participate in the April 3, 2018 campus event on the Boycott, Divestment, and Sanctions movement.

## RELIEF REQUESTED

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request this Honorable Court GRANT their Application for Preliminary Injunctive Relief, and grant costs, attorneys' fees, and all such other relief to which Plaintiffs are entitled.

Dated:  March 2, 2018

**CAIR LEGAL DEFENSE FUND**

By /s/ Lena F. Masri
Lena F. Masri (D.C. Bar No. 100019)
(seeking *pro hac vice* admission)
Gadeir I. Abbas (VA Bar No. 81161)*
(seeking *pro hac vice* admission)
Carolyn M. Homer (D.C. Bar No. 1049145)
(seeking *pro hac vice* admission)
453 New Jersey Ave., SE
Washington, DC 20003
Phone: (202) 742-6420
Fax:   (202) 379-3317

*Licensed in VA, not in D.C.*
*Practice limited to federal matters*

**KELLY / WARNER, PLLC**

By /s/Raees Mohamed
    Raees Mohamed, Esq. (AZ Bar # 027418)
    8283 N. Hayden Road, Suite 229
    Scottsdale, Arizona 85258
    Phone: (480) 331-9397
    Fax:    (866) 961-4984

    *Attorneys for Plaintiffs*

MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

# APPENDIX

REFERENCE TITLE: Israel; boycotts; contracts; investments

State of Arizona
House of Representatives
Fifty-second Legislature
Second Regular Session
2016

# HB 2617

Introduced by
Representatives Gowan, Allen J, Barton, Borrelli, Bowers, Boyer, Cardenas,
Cobb, Fann, Finchem, Gray, Kern, Livingston, Mitchell, Montenegro, Olson,
Saldate, Stevens, Thorpe, Senators Barto, Begay, Dial, Driggs, Kavanagh:
Representatives Brophy McGee, Campbell, Carter, Coleman, Espinoza,
Lawrence, Leach, Mesnard, Norgaard, Petersen, Rios, Rivero, Shope,
Townsend, Weninger, Senators Donahue, Lesko, Shooter

AN ACT

AMENDING TITLE 35, CHAPTER 2, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 9;
RELATING TO PUBLIC CONTRACTS AND INVESTMENTS.

(TEXT OF BILL BEGINS ON NEXT PAGE)

```
1   Be it enacted by the Legislature of the State of Arizona:
2        Section 1.  Title 35, chapter 2, Arizona Revised Statutes, is amended
3   by adding article 9, to read:
4             ARTICLE 9.  ISRAEL BOYCOTT DIVESTMENTS
5        35-393.  Definitions
6        IN THIS ARTICLE, UNLESS THE CONTEXT OTHERWISE REQUIRES:
7        1.  "BOARD" MEANS THE STATE BOARD OF INVESTMENT ESTABLISHED BY SECTION
8   35-311.
9        2.  "BOYCOTT" MEANS ENGAGING IN A REFUSAL TO DEAL, TERMINATING BUSINESS
10  ACTIVITIES OR PERFORMING OTHER ACTIONS THAT ARE INTENDED TO LIMIT COMMERCIAL
11  RELATIONS WITH ISRAEL OR WITH PERSONS OR ENTITIES DOING BUSINESS IN ISRAEL OR
12  IN TERRITORIES CONTROLLED BY ISRAEL, IF THOSE ACTIONS ARE TAKEN EITHER:
13       (a)  IN COMPLIANCE WITH OR ADHERENCE TO CALLS FOR A BOYCOTT OF ISRAEL
14  OTHER THAN THOSE BOYCOTTS TO WHICH 50 UNITED STATES CODE SECTION 4607(c)
15  APPLIES.
16       (b)  IN A MANNER THAT DISCRIMINATES ON THE BASIS OF NATIONALITY,
17  NATIONAL ORIGIN OR RELIGION AND THAT IS NOT BASED ON A VALID BUSINESS REASON.
18       3.  "COMPANY" MEANS A SOLE PROPRIETORSHIP, ORGANIZATION, ASSOCIATION,
19  CORPORATION, PARTNERSHIP, JOINT VENTURE, LIMITED PARTNERSHIP, LIMITED
20  LIABILITY PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY OR BUSINESS
21  ASSOCIATION, AND INCLUDES A WHOLLY OWNED SUBSIDIARY, MAJORITY-OWNED
22  SUBSIDIARY, PARENT COMPANY OR AFFILIATE.
23       4.  "DIRECT HOLDINGS" MEANS ALL PUBLICLY TRADED SECURITIES OF A COMPANY
24  THAT ARE HELD DIRECTLY BY THE STATE TREASURER OR A RETIREMENT SYSTEM IN AN
25  ACTIVELY MANAGED ACCOUNT OR FUND IN WHICH THE RETIREMENT SYSTEM OWNS ALL
26  SHARES OR INTERESTS.
27       5.  "INDIRECT HOLDINGS" MEANS ALL SECURITIES OF A COMPANY THAT ARE HELD
28  IN AN ACCOUNT OR FUND, INCLUDING A MUTUAL FUND, THAT IS MANAGED BY ONE OR
29  MORE PERSONS WHO ARE NOT EMPLOYED BY THE STATE TREASURER OR A RETIREMENT
30  SYSTEM, IF THE STATE TREASURER OR RETIREMENT SYSTEM OWNS SHARES OR INTERESTS
31  EITHER:
32       (a)  TOGETHER WITH OTHER INVESTORS THAT ARE NOT SUBJECT TO THIS
33  SECTION.
34       (b)  THAT ARE HELD IN AN INDEX FUND.
35       6.  "PUBLIC ENTITY" MEANS THIS STATE, A POLITICAL SUBDIVISION OF THIS
36  STATE OR AN AGENCY, BOARD, COMMISSION OR DEPARTMENT OF THIS STATE OR A
37  POLITICAL SUBDIVISION OF THIS STATE.
38       7.  "RESTRICTED COMPANIES" MEANS COMPANIES THAT BOYCOTT ISRAEL.
39       8.  "RETIREMENT SYSTEM" MEANS A RETIREMENT PLAN OR SYSTEM THAT IS
40  ESTABLISHED BY OR PURSUANT TO TITLE 38.
41       35-393.01.  Contracting; prohibition; exceptions
42       A.  A PUBLIC ENTITY MAY NOT ENTER INTO A CONTRACT WITH A COMPANY TO
43  ACQUIRE OR DISPOSE OF SERVICES, SUPPLIES, INFORMATION TECHNOLOGY OR
44  CONSTRUCTION UNLESS THE CONTRACT INCLUDES A WRITTEN CERTIFICATION THAT THE
```

1   COMPANY IS NOT CURRENTLY ENGAGED IN, AND AGREES FOR THE DURATION OF THE
2   CONTRACT TO NOT ENGAGE IN, A BOYCOTT OF ISRAEL.
3       B.  THIS SECTION DOES NOT APPLY IF EITHER:
4       1.  THE COMPANY OFFERS TO PROVIDE THE SERVICES, SUPPLIES, INFORMATION
5   TECHNOLOGY OR CONSTRUCTION FOR AT LEAST TWENTY PERCENT LESS THAN EACH OTHER
6   QUALIFIED COMPANY.
7       2.  THE CONTRACT HAS A TOTAL POTENTIAL VALUE OF LESS THAN ONE THOUSAND
8   DOLLARS.
9       35-393.02.  Investment; restricted companies list; notice;
10                      immunity
11      A.  ON OR BEFORE APRIL 1 OF EACH YEAR, THE BOARD SHALL PREPARE A LIST
12  OF RESTRICTED COMPANIES AND SHALL DISTRIBUTE THE LIST TO THE STATE TREASURER
13  AND EACH RETIREMENT SYSTEM.
14      B.  IN PREPARING THE LIST OF RESTRICTED COMPANIES, THE BOARD MAY
15  CONSIDER AT LEAST THE FOLLOWING:
16      1.  PUBLICLY AVAILABLE INFORMATION, INCLUDING INFORMATION PROVIDED BY
17  NONPROFIT ORGANIZATIONS, RESEARCH FIRMS AND GOVERNMENT ENTITIES.
18      2.  INFORMATION PREPARED BY AN INDEPENDENT RESEARCH FIRM RETAINED BY
19  THE BOARD.
20      3.  A STATEMENT BY A COMPANY THAT IT IS PARTICIPATING IN A BOYCOTT OF
21  ISRAEL OR THAT IT HAS TAKEN A BOYCOTT ACTION AT THE REQUEST OF, IN COMPLIANCE
22  WITH OR IN FURTHERANCE OF CALLS FOR A BOYCOTT OF ISRAEL.
23      C.  THE BOARD SHALL NOTIFY EACH COMPANY THAT IS INCLUDED ON THE LIST OF
24  RESTRICTED COMPANIES THAT THE COMPANY IS SUBJECT TO DIVESTMENT BY THE STATE
25  TREASURER AND THE RETIREMENT SYSTEMS.
26      D.  IF A COMPANY THAT RECEIVES NOTICE PURSUANT TO SUBSECTION C OF THIS
27  SECTION SUBMITS A WRITTEN CERTIFICATION TO THE BOARD THAT IT HAS CEASED ITS
28  BOYCOTT OF ISRAEL AND WILL NOT ENGAGE IN A BOYCOTT OF ISRAEL FOR THE PERIOD
29  OF TIME THAT THE STATE TREASURER OR A RETIREMENT SYSTEM INVESTS IN THE
30  COMPANY, THE BOARD SHALL:
31      1.  REMOVE THE COMPANY FROM THE RESTRICTED LIST.
32      2.  NOTIFY THE STATE TREASURER AND THE RETIREMENT SYSTEMS WITHIN TEN
33  BUSINESS DAYS AFTER RECEIPT OF THE WRITTEN CERTIFICATION OF THE REMOVAL.
34      E.  THE STATE TREASURER AND EACH RETIREMENT SYSTEM SHALL:
35      1.  SELL, REDEEM, DIVEST OR WITHDRAW ALL DIRECT HOLDINGS OF A
36  RESTRICTED COMPANY FROM THE ASSETS UNDER THEIR MANAGEMENT IN AN ORDERLY AND
37  FIDUCIALLY RESPONSIBLE MANNER WITHIN THREE MONTHS AFTER RECEIVING THE LIST OF
38  RESTRICTED COMPANIES PURSUANT TO SUBSECTION A OF THIS SECTION.  ON OR BEFORE
39  AUGUST 1 OF EACH YEAR, THE STATE TREASURER AND EACH RETIREMENT SYSTEM SHALL
40  NOTIFY THE BOARD REGARDING INVESTMENTS THAT ARE SOLD, REDEEMED, DIVESTED OR
41  WITHDRAWN PURSUANT TO THIS PARAGRAPH.
42      2.  NOT ACQUIRE SECURITIES OF A RESTRICTED COMPANY AS PART OF THEIR
43  DIRECT HOLDINGS.

1  3.  REQUEST THAT MANAGERS OF THEIR INDIRECT HOLDINGS CONSIDER SELLING,
2  REDEEMING, DIVESTING OR WITHDRAWING HOLDINGS OF A RESTRICTED COMPANY FROM THE
3  ASSETS UNDER THEIR MANAGEMENT.
4  F.  WITH RESPECT TO ANY ACTION PERFORMED PURSUANT TO THIS SECTION, THE
5  BOARD, THE STATE TREASURER, EACH RETIREMENT SYSTEM AND ANY PERSON ACTING ON
6  BEHALF OF THE BOARD, THE STATE TREASURER OR THE RETIREMENT SYSTEM:
7  1.  ARE EXEMPT FROM ANY CONFLICTING STATUTORY OR COMMON LAW OBLIGATION
8  OR FIDUCIARY DUTIES WITH RESPECT TO CHOICE OF ASSET MANAGERS, INVESTMENT
9  FUNDS OR INVESTMENTS.
10  2.  ARE SUBJECT TO TITLE 12, CHAPTER 7, ARTICLE 2 REGARDING IMMUNITY
11  FOR ACTS AND OMISSIONS.
12  3.  ARE INDEMNIFIED AND HELD HARMLESS BY THIS STATE FROM CLAIMS,
13  DEMANDS, SUITS, ACTIONS, DAMAGES, JUDGMENTS, COSTS, CHARGES AND EXPENSES,
14  INCLUDING ATTORNEY FEES, AND AGAINST ALL LIABILITY, LOSSES AND DAMAGES
15  BECAUSE OF A DECISION TO SELL, REDEEM, DIVEST OR WITHDRAW HOLDINGS OF A
16  RESTRICTED COMPANY MADE PURSUANT TO THIS SECTION.
17  35-393.03.  Severability
18  IF ANY PROVISION OF THIS ARTICLE OR ITS APPLICATION TO ANY PERSON OR
19  CIRCUMSTANCE IS HELD INVALID, THE INVALIDITY DOES NOT AFFECT ANY OTHER
20  PROVISION OR APPLICATION OF THIS ARTICLE THAT CAN BE GIVEN EFFECT WITHOUT THE
21  INVALID PROVISION OR APPLICATION, AND TO THIS END THE PROVISIONS OF THIS
22  ARTICLE ARE SEVERABLE.
23  Sec. 2.  Legislative findings
24  A.  Boycotts and related tactics have become a tool of economic warfare
25  that threaten the sovereignty and security of key allies and trade partners
26  of the United States.
27  B.  The state of Israel is the most prominent target of such boycott
28  activity, beginning with the Arab League Boycott adopted in 1945, even before
29  Israel's declaration of independence as the reestablished national state of
30  the Jewish people.
31  C.  Companies that refuse to deal with United States trade partners
32  such as Israel, or entities that do business with or in such countries, make
33  discriminatory decisions on the basis of national origin that impair those
34  companies' commercial soundness.
35  D.  It is the public policy of the United States, as enshrined in
36  several federal acts, including 50 United States Code section 4607, to oppose
37  such boycotts, and Congress has concluded as a matter of national trade
38  policy that cooperation with Israel materially benefits United States
39  companies and improves American competitiveness.
40  E.  Israel in particular is known for its dynamic and innovative
41  approach in many business sectors, and a company's decision to discriminate
42  against Israel, Israeli entities or entities that do business with Israel or
43  in Israel is an unsound business practice making the company an unduly risky
44  contracting partner or vehicle for investment.

HB 2617

1      F.  This state seeks to implement Congress's announced policy of
2  "examining a company's promotion or compliance with unsanctioned boycotts,
3  divestment from, or sanctions against Israel as part of its consideration in
4  awarding grants and contracts and supports the divestment of State assets
5  from companies that support or promote actions to boycott, divest from, or
6  sanction Israel."