**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (D.C. Bar # 100019) (seeking *pro hac vice* admission)
Email:  lmasri@cair.com
Gadeir I. Abbas* (VA Bar # 81161) (seeking *pro hac vice* admission)
Email:  gabbas@cair.com
Carolyn M. Homer (D.C. Bar # 1049145) (seeking *pro hac vice* admission)
Email: chomer@cair.com
453 New Jersey Ave., SE
Washington, DC 20003
Phone: (202) 742-6420
Fax:     (202) 379-3317

**KELLY / WARNER, PLLC**
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Raeesabbas Mohamed, Esq. (AZ Bar # 027418)
Email: raees@kellywarnerlaw.com
Phone: (480) 331-9397
Fax:     (866) 961-4984

*Attorneys for Plaintiffs*

   * *Licensed in VA, not in D.C.*
     *Practice limited to federal matters*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

| | |
|---|---|
| **AMERICAN MUSLIMS FOR PALESTINE** and **DR. HATEM BAZIAN**<br><br>Plaintiffs,<br><br>vs.<br><br>**ARIZONA STATE UNIVERSITY**; **ARIZONA BOARD OF REGENTS**; and **MARK BRNOVICH,** in his official capacity as Attorney General of Arizona<br><br>Defendants. | Case No.  CV-18-670-PHX-JJT<br><br>**DECLARATION OF DR. HATEM BAZIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

# DECLARATION OF DR. HATEM BAZIAN

1. I am Dr. Hatem Bazian, a Palestinian American and the founder and chair of American Muslims for Palestine ("AMP"). I have personal knowledge of the facts set out in this Declaration. If called upon as a witness I would competently testify as to the matters stated herein.

2. I earned my Ph.D. in Philosophy and Islamic Studies from the University of California, Berkeley. In 2009 I founded the Center for the Study and Documentation of Islamophobia at Berkeley, and in 2012 I launched the Islamophobia Studies Journal. I continue to serve as a Lecturer at Berkeley. I also am a Professor of Islamic Law and Theology at Zaytuna College, the first Muslim Liberal Arts College in the United States, which I helped found. In addition to American Muslims for Palestine I serve on the boards of multiple non-profit organizations, including the Islamic Scholarship Fund, the Muslim Legal Fund of America, and the Northern California Islamic Council.

3. I am an internationally-recognized, leading academic on the study of Islamophobia. I am regularly invited to present before universities, government bodies, academic conferences, and other events around the world. In addition to a multitude of presentations throughout the United States, in recent years I have spoken in the United Kingdom, Germany, Norway, Sweden, France, Netherlands, Spain, Turkey, Qatar, India, and Mexico. My presentations typically relate to my

research and advocacy, including discussions of Islamophobia, the Palestinian Conflict, and the Boycott, Divestment and Sanctions ("BDS") movement.

**Background To The BDS Movement**

4. The BDS movement relates to the internationally significant modern political conflict between Israel and Palestine. Of particular note in that conflict is Israel's 1948 capture of Palestinian territories during the Arab-Israeli War, and Israel's occupation of additional Palestinian territories following the Six-Day War in 1967. Since that time, Israel has continued to control, occupy, and settle Palestinian territories, particularly the West Bank and Golan Heights.

5. On December 23, 2016, the United Nations Security Council unanimously (with the United States abstaining) adopted U.N. Resolution 2334 (the "Resolution"). A true and correct copy of that Resolution is attached as **Exhibit A**. The Resolution condemned Israeli settlements in Palestinian Territory and Israeli maltreatment of Palestinians. The United States abstained from the vote because it is a close political, economic, and military ally of Israel. Although official United States policy is to discourage Israeli settlements in Palestinian territory, the United States has not historically taken formal action to advance that position.

6. The merits of all perspectives on the Israel-Palestine conflict and the U.S.'s political actions related to it are robustly and publicly debated by leading politicians, academics, universities, non-profit organizations, businesses, and media pundits in the United States and around the world.

7. A major force in the international debate over Israel and Palestine is the Boycott, Divestment, and Sanctions movement. The BDS movement began on July

9, 2005 when a plan for Boycott, Divestment, and Sanctions of Israel was endorsed by a broad coalition of Palestinian civil society, including more than 170 political parties, unions, coalitions and organizations. The BDS Call, as it is colloquially known, identifies three specific goals for its activism. It seeks to (1) End Israeli occupation and settlement in Palestinian lands; (2) Recognize Palestinians living in Israel as full citizens with equal fundamental rights; and (3) Provide Palestinian refugees with a right of return to their homes.

8. The BDS movement strives to peacefully impose pressure on Israel to comply with international law related to Palestine. Although BDS's goals are well-defined, the BDS movement as a whole is not centrally controlled. Rather, individuals and organizations across the globe formulate their own economic, cultural, and political initiatives to advance the BDS movement and the cause of justice for Palestine. The BDS movement is comprised of a wide range of economic and cultural boycotts against the Israeli government as well as Israeli and American companies which facilitate, in violation of international law, the occupation of Palestinian territories and human rights violations against Palestinians.

## My Involvement In The BDS Movement

9. I have been involved in the Boycott, Divestment and Sanctions movement since its original call was issued in 2005. I am a recognized leader of the BDS movement in the United States. Since the launch of the BDS movement in 2005, I have worked to coordinate advocacy efforts both by Palestinians living in Israel and Palestine, and by Palestinian allies in the United States. I have worked with numerous organizations which support the BDS movement. These

organizations include the Students for Justice in Palestine, Arab Students Association, Muslim Students Association, Jewish Voices for Peace, the Asian American Studies Association, and the American Academy of Religion, and various progressive Christian communities including the Presbyterians and Universalists.

10. Back in the 1980s, I advocated in the United States for economic boycotts of South Africa due to that nation's perpetuation of its racially discriminatory apartheid system.  I particularly supported a boycott of Coca-Cola products in grocery stores and on college campuses due to that company's complicity in South African apartheid.  By 1986, and in large part due to these economic boycotts, Coca-Cola chose to cut ties with South Africa and instead donate millions to support human rights and equality.  I believe Israel's continuing violations of international law as relates to Palestine, particularly Israel's occupation of Palestinian territories and treatment of Palestinians living in Israel as second-class citizens who cannot exercise basic fundamental rights, bears a striking resemblance to South African apartheid.

11. In reliance on my experience combatting South African apartheid, I have spent much of the last 15 years developing and implementing a strategic vision for BDS and Palestinian education and advocacy on college campuses.  In recent years I have supported student events at UC – Berkeley, UC – Davis, UC – Irvine, UC – San Diego, UCLA, San Diego State University, San Francisco State University, the University of Michigan, and the University of Chicago, among

others.  Prior to 2016, I had also previously presented at both Arizona State University and the University of Arizona.

**My Invitation To Speak On The BDS Movement At Arizona State University**

12. On February 22, 2018, I received an invitation from the Muslim Students Association at Arizona State University to speak at an April 3, 2018 campus event.  The purpose of the event is to educate the university community about the global BDS movement. I strongly support such student activities and would ordinarily be pleased to accept the invitation.  A true and correct copy of the February 22, 2018 invitation contract I received is attached as **Exhibit B**.

13. Notably, attached to the invitation was Arizona State University's standard "Speaker / Artist / Performer Agreement."  Over the years I have signed many similar agreements for routine speaking engagements at many different state universities.  This one, however, stood out.  Frankly, it shocked me.  For the first time to my recollection, a boilerplate university speaker contract contained an express restriction on my personal advocacy, speech, and expressive conduct.

14. Paragraph 20 of the Agreement requires me to swear:  "No Boycott of Israel. As required by Arizona Revised Statutes § 35-393.01, Entity certifies it is not currently engaged in a boycott of Israel and will not engage in a boycott of Israel during the term of this Contract."   I cannot assent to that clause.  I am a leader of the BDS movement in America, and my anticipated April 3, 2018 lecture at ASU would include discussion of the historical context for the global BDS movement.  I personally both engage in and advocate for political, economic, and cultural boycotts of Israel due to that nation's continuing violations of international law with

– 5 –

respect to Palestinians. I cannot cease my boycott, even temporarily, to accede to Arizona's contractual requirements and continue to serve my community in the manner I have previously.

15. It is clear to me that Arizona was specifically attempting to favor Israel and silence political support for Palestine and the BDS movement when it adopted Arizona Revised Statutes § 35-393 in 2016. This offends me as both a Professor committed to academic freedom and as an American committed to the First Amendment. Americans have a fundamental right to speak out against official policy positions of state and federal governments, and advocate for change. Boycotts in support of political advocacy are found throughout our nation's history and have been recognized as protected expression by the Supreme Court. Even more significantly, the right of Americans to speak out against the policies and civil rights abuses of *foreign* governments is foundational to American democracy. The Declaration of Independence was itself premised on political criticism and boycotts of British rule. For the State of Arizona to bar me from speaking at a state university on the sole basis that I advocate for Palestine and support BDS boycotts of Israel is nothing short of censorship.

16. I have no objection to Arizona State University's "Speaker / Artist / Performer Agreement" other than Paragraph 20, the "No Boycott of Israel" clause. I have already blocked off April 3, 2018 on my calendar for attendance at the Muslim Students Association's BDS event at Arizona State University. If the "No

Boycott of Israel" clause is stricken or declared unenforceable, I will sign the Agreement, enabling me to speak at the April 3, 2018 event.

17.  I verify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 26 2018 at Berkeley, California.

By: *Hatem Bazian*
Dr. Hatem Bazian

# Exhibit A

United Nations                                                                S/RES/2334 (2016)

 Security Council

Distr.: General
23 December 2016

## Resolution 2334 (2016)

### Adopted by the Security Council at its 7853rd meeting, on 23 December 2016

*The Security Council,*

*Reaffirming* its relevant resolutions, including resolutions 242 (1967), 338 (1973), 446 (1979), 452 (1979), 465 (1980), 476 (1980), 478 (1980), 1397 (2002), 1515 (2003), and 1850 (2008),

*Guided* by the purposes and principles of the Charter of the United Nations, and reaffirming, *inter alia*, the inadmissibility of the acquisition of territory by force,

*Reaffirming* the obligation of Israel, the occupying Power, to abide scrupulously by its legal obligations and responsibilities under the Fourth Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, and *recalling* the advisory opinion rendered on 9 July 2004 by the International Court of Justice,

*Condemning* all measures aimed at altering the demographic composition, character and status of the Palestinian Territory occupied since 1967, including East Jerusalem, including, *inter alia*, the construction and expansion of settlements, transfer of Israeli settlers, confiscation of land, demolition of homes and displacement of Palestinian civilians, in violation of international humanitarian law and relevant resolutions,

*Expressing* grave concern that continuing Israeli settlement activities are dangerously imperilling the viability of the two-State solution based on the 1967 lines,

*Recalling* the obligation under the Quartet Roadmap, endorsed by its resolution 1515 (2003), for a freeze by Israel of all settlement activity, including "natural growth", and the dismantlement of all settlement outposts erected since March 2001,

*Recalling* also the obligation under the Quartet roadmap for the Palestinian Authority Security Forces to maintain effective operations aimed at confronting all those engaged in terror and dismantling terrorist capabilities, including the confiscation of illegal weapons,

*Condemning* all acts of violence against civilians, including acts of terror, as well as all acts of provocation, incitement and destruction,

*Reiterating* its vision of a region where two democratic States, Israel and Palestine, live side by side in peace within secure and recognized borders,

*Stressing* that the status quo is not sustainable and that significant steps, consistent with the transition contemplated by prior agreements, are urgently needed in order to (i) stabilize the situation and to reverse negative trends on the ground, which are steadily eroding the two-State solution and entrenching a one-State reality, and (ii) to create the conditions for successful final status negotiations and for advancing the two-State solution through those negotiations and on the ground,

1. *Reaffirms* that the establishment by Israel of settlements in the Palestinian territory occupied since 1967, including East Jerusalem, has no legal validity and constitutes a flagrant violation under international law and a major obstacle to the achievement of the two-State solution and a just, lasting and comprehensive peace;

2. *Reiterates* its demand that Israel immediately and completely cease all settlement activities in the occupied Palestinian territory, including East Jerusalem, and that it fully respect all of its legal obligations in this regard;

3. *Underlines* that it will not recognize any changes to the 4 June 1967 lines, including with regard to Jerusalem, other than those agreed by the parties through negotiations;

4. *Stresses* that the cessation of all Israeli settlement activities is essential for salvaging the two-State solution, and calls for affirmative steps to be taken immediately to reverse the negative trends on the ground that are imperilling the two-State solution;

5. *Calls* upon all States, bearing in mind paragraph 1 of this resolution, to distinguish, in their relevant dealings, between the territory of the State of Israel and the territories occupied since 1967;

6. *Calls* for immediate steps to prevent all acts of violence against civilians, including acts of terror, as well as all acts of provocation and destruction, calls for accountability in this regard, and calls for compliance with obligations under international law for the strengthening of ongoing efforts to combat terrorism, including through existing security coordination, and to clearly condemn all acts of terrorism;

7. *Calls upon* both parties to act on the basis of international law, including international humanitarian law, and their previous agreements and obligations, to observe calm and restraint, and to refrain from provocative actions, incitement and inflammatory rhetoric, with the aim, *inter alia*, of de-escalating the situation on the ground, rebuilding trust and confidence, demonstrating through policies and actions a genuine commitment to the two-State solution, and creating the conditions necessary for promoting peace;

8. *Calls upon* all parties to continue, in the interest of the promotion of peace and security, to exert collective efforts to launch credible negotiations on all final status issues in the Middle East peace process and within the time frame specified by the Quartet in its statement of 21 September 2010;

**2/3**

9. *Urges in this regard* the intensification and acceleration of international and regional diplomatic efforts and support aimed at achieving, without delay a comprehensive, just and lasting peace in the Middle East on the basis of the relevant United Nations resolutions, the Madrid terms of reference, including the principle of land for peace, the Arab Peace Initiative and the Quartet Roadmap and an end to the Israeli occupation that began in 1967; and *underscores* in this regard the importance of the ongoing efforts to advance the Arab Peace Initiative, the initiative of France for the convening of an international peace conference, the recent efforts of the Quartet, as well as the efforts of Egypt and the Russian Federation;

10. *Confirms its determination* to support the parties throughout the negotiations and in the implementation of an agreement;

11. *Reaffirms* its determination to examine practical ways and means to secure the full implementation of its relevant resolutions;

12. *Requests* the Secretary-General to report to the Council every three months on the implementation of the provisions of the present resolution;

13. *Decides* to remain seized of the matter.

---

# Exhibit B



# SPEAKER/ARTIST/PERFORMER AGREEMENT

This Agreement is entered into as of _____, 20__, between the Arizona Board of Regents acting for and on behalf of Arizona State University ("*ASU*") and _____ [1]("*Speaker*"), or _____, a _____ _____,[2] as the authorized agent for Speaker. If Speaker is represented by an authorized agent, then references to Speaker herein will also refer to the authorized agent, where appropriate.

1. Engagement; Event.  ASU hereby engages Speaker to personally provide the following services, and Speaker agrees to personally provide to ASU the following services (the "*Presentation*") at the following Event (the "*Event*"):

   Event/Location: _____

   Dates and times of Event:_____

   Speaker's Presentation schedule: _____

   Title of Speaker's Presentation: _____

   Speaker's hospitality requirements: _____

   Speaker's technical requirements: _____

2. Notice.  Any communication or notice required under this Agreement shall be in writing and may either be given by personal delivery or sent, in all cases, against receipt, addressed to the following:

   | If to ASU: | If to Speaker: |
   |---|---|
   | _____ | _____ |
   | _____ | _____ |
   | Attn: _____ | Attn: _____ |
   | Email: _____ | Email: _____ |

   Notice shall be deemed to be received upon receipt by the receiving party.

3. Speaker Warranty.  Speaker warrants that at all times during the Event, Speaker will personally provide Speaker's best professional efforts. Speakers' professional credentials are such that Speaker can provide the Presentation in a knowledgeable and professional manner.

4. Payment.  ASU shall pay Speaker the all-inclusive fee of $_____ upon completion of the Presentation. Speaker shall complete a Substitute W-9 Form, which must be signed by the person or entity to whom payment is to be issued. ASU will issue all payment in accordance with the information on the completed and signed Substitute W-9 Form.

---

1 – If an authorized agent is signing, please be sure to fill in the speaker name as well.
2 – Include full legal name of authorized agent, state of formation, and type of entity (for example: ABC, Inc., an Arizona Corporation.)

1

5. Acceptance of Agreement.  Speaker will accept and return this Agreement to ASU no later than _____, 20__.  In all events, this Agreement must be fully signed and received at ASU at least one week prior to the Event to allow on-time payment. This Agreement must be fully signed before payment can be processed. Please return a signed copy of this Agreement to ASU at the address set forth in Section 16.

6. Compliance with Law.  Speaker will comply with all applicable published ASU, City, County, State and Federal laws, acts, codes, regulations and policies, including all applicable federal immigration laws and regulations that relate to employment.

7. Press Materials.  Speaker shall timely supply all press/promotion material requested by ASU.

8. Educational Component.  ASU is required to include some type of educational component with every program presented by ASU. Speaker shall work with ASU to develop a satisfactory educational component.

9. Indemnity.  Speaker shall indemnify, defend, and hold ASU harmless for, from, and against, any all claims, demands, suits, costs and damages (including reasonable attorneys' fees) that ASU may incur by reason of any:  (a) actual or alleged infringement or violation of any copyright, or other proprietary right by Speaker; (b) claim for damages arising from Speaker's Presentation; or (c) any of Speaker's costs and liabilities arising out of the Presentation or Event, including without limitation:  travel and meal expenses; union dues;  taxes; agents' commissions or other expenses or obligations; damages to Speaker's equipment or materials; compensation to third parties engaged by Speaker; compensation for lost or stolen equipment or materials; workers compensation or other insurance; and any expenses not preapproved by ASU in writing.

10. Indemnification Limitation.  ASU is a public institution and, as such, any indemnification, liability limitation, or hold harmless provision will be limited as required by Arizona law, including without limitation Article 9, Sections 5 and 7 of the Arizona Constitution and A.R.S. §§ 35-154 and 41-621. Therefore, notwithstanding any other provision of this Agreement to the contrary, ASU's liability under any claim for indemnification is limited to claims for property damage, personal injury, or death to the extent caused by acts or omissions of ASU.

11. Default, Remedies, Force Majeure, Cancellation.

   11.1  Default.  Failure by either party to perform as specifically described herein shall be deemed to be an "*Event of Default*" hereunder.

   11.2  Remedies.  Upon the occurrence of an Event of Default, the non-defaulting party (1) shall have all the remedies afforded by law and in equity; and (2) shall have the right to terminate this Agreement.

   11.3  Force Majeure.  Neither Speaker nor ASU shall be liable for failure to perform hereunder if failure is caused by civil tumult, strike, epidemic, or any cause beyond the control of the parties.  Labor difficulties due to the ingestion of alcohol or illegal substances will not be deemed labor difficulties and will not be deemed an event of Force Majeure.

   11.4  Cancellation.  If the Event is cancelled by ASU, reasonable efforts will be made to reschedule.

12. Liability; Insurance.  Speaker, at its expense, will procure and maintain, for the duration of the Event, a policy of commercial general liability insurance in an amount of not less than $1,000,000, single limit, against claims for bodily injury, death and property damage occurring in connection with the Event and the Presentation. This insurance must name the Arizona Board of Regents, Arizona State University, and the

2

State of Arizona as additional insureds. Speaker must provide ASU with a certificate evidencing this insurance coverage no later than 10 days prior to the Presentation.

13. No Assignment.  Neither party shall have the right to assign any rights or obligations under this Agreement without the prior written consent of the other party.

14. Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. No prior or contemporaneous agreement or understanding will be effective.

15. Governing Law and Venue.  This Agreement will be governed by the laws of the State of Arizona without regard to any conflicts of laws principles. ASU's obligations hereunder are subject to the regulations/policies of the Arizona Board of Regents. Any proceeding arising out of or relating to this Agreement will be conducted in Maricopa County, Arizona. Each party waives any objection it may now or hereafter have to venue or to convenience of forum.

16. Independent Contractor.  Speaker is an independent contractor and is not an employee of ASU. Neither Speaker nor any personnel of Speaker will for any purpose be considered employees or agents of ASU. Speaker assumes full responsibility for the actions of Speaker's personnel, and is solely responsible for their supervision, direction and control, payment of salary and expenses (including withholding income taxes and social security), worker's compensation, and disability benefits.

17. Recordings; Use of Name and Likeness.  Both parties may record the Presentation for internal records. No recording of the Presentation, either visual or audio, will be made by or on behalf of Speaker for the purposes of profit or significant distribution without prior written approval from ASU. ASU may require an additional payment for the privilege, and may require Speaker to sign a filming/recording agreement. ASU may record the Presentation on video tape, audio tape, film, photograph or any other medium, use Speaker's name, likeness, voice and biographical material in connection with these recordings for purposes within the ASU mission, including education and research, and exhibit or distribute the recording in whole or in part without restrictions or limitation for any educational or promotional purpose that ASU deems appropriate.

18. No Revenue Sharing.  Speaker shall not participate in any revenues associated with the Presentation or Event. This includes: sponsorship, ticketing, ticketing fees, ASU concessions revenues, and any other revenue streams that may be associated with the Event.

19. Non-discrimination.  The parties will comply with all applicable state and federal laws, rules, regulations, and executive orders governing equal employment opportunity, immigration, and nondiscrimination, including the Americans with Disabilities Act. **If applicable, the parties will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability**.

20. No Boycott of Israel**.** As required by Arizona Revised Statutes § 35-393.01, Entity certifies it is not currently engaged in a boycott of Israel and will not engage in a boycott of Israel during the term of this Contract.

21. Conflicts of Interest.  In accordance with Arizona Revised Statutes ("*A.R.S.*") § 38-511, ASU may cancel this Agreement within three years after the execution of this Agreement, without penalty or further obligation, if any person significantly involved in initiating, negotiating, securing, drafting, or creating this

3

Agreement on behalf of ASU, at any time while this Agreement or any extension thereof is in effect, is an employee or agent of any other party to this Agreement in any capacity or a consultant to any other party with respect to the subject matter of this Agreement. Notice is provided of A.R.S. § 41-753D.

22. <u>Arbitration in Superior Court</u>.  In the event of litigation, as required by A.R.S. § 12-1518, the parties agree to make use of arbitration in all contracts that are subject to mandatory arbitration pursuant to rules adopted under A.R.S. § 12-133.

23. <u>Records</u>.  To the extent required by A.R.S. § 35-214, the non-ASU parties to this Agreement (jointly and severally, "*Entity*") will retain all records relating to this Agreement. Entity will make those records available at all reasonable times for inspection and audit by ASU or the Auditor General of the State of Arizona during the term of this Agreement and for a period of five years after the completion of this Agreement. The records will be provided at Arizona State University, Tempe, Arizona, or another location designated by ASU on reasonable notice to Entity.

24. <u>Failure of Legislature to Appropriate</u>.  In accordance with A.R.S. § 35-154, if ASU's performance under this Agreement depends on the appropriation of funds by the Arizona Legislature, and if the Legislature fails to appropriate the funds necessary for performance, then ASU may provide written notice of this to Entity and cancel this Agreement without further obligation of ASU. Appropriation is a legislative act and is beyond the control of ASU.

25. <u>Weapons, Explosive Devices, and Fireworks</u>.  ASU prohibits the use, possession, display or storage of any weapon, explosive device or fireworks on all land and buildings owned, leased, or under the control of ASU or its affiliated or related entities, in all ASU residential facilities (whether managed by ASU or another entity), in all ASU vehicles, and at all ASU or ASU affiliate sponsored events and activities, except as provided in A.R.S. § 12-781 or unless written permission is given by the Chief of the ASU Police Department or a designated representative. Notification by Entity to all persons or entities who are employees, officers, subcontractors, consultants, agents, guests, invitees or licensees of Entity ("*Entity Notification Parties*") of this policy is a condition and requirement of this Agreement. Entity further agrees to enforce this contractual requirement against all Entity Notification Parties. ASU's policy may be accessed through the following web page: http://www.asu.edu/aad/manuals/pdp/pdp201-05.html.

26. <u>Student Educational Records</u>.  Student educational records are protected by the federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("*FERPA*"). Entity will comply with FERPA and will not access or make any disclosures of student educational records to third parties without prior notice to and consent from ASU or as otherwise provided by law. If this Agreement contains a scope of work or any provision that requires or permits Entity to access or release any student records, then, for purposes of this Agreement only, ASU hereby designates Entity as a "school official" for ASU under FERPA, as that term is used in FERPA and its implementing regulations. As such, Entity will comply with FERPA and will not make any disclosures of ASU students' educational records to third parties without prior notice to, and consent from, ASU or as otherwise permitted by law. In addition, any access or disclosures of student educational records made by Entity or its employees and agents must comply with ASU's definition of legitimate educational purpose, which definition can be found at: SSM 107-01: Release of Student Information (http://www.asu.edu/aad/manuals/ssm/ssm107-01.html). If Entity violates the terms of this section, Entity will immediately provide notice of the violation to ASU.

27. <u>Authorized Presence Requirements</u>.  As required by A.R.S. § 41-4401, ASU is prohibited from awarding a contract to any contractor or subcontractor that fails to comply with A.R.S. § 23-214(A) (verification of employee eligibility through the e-verify program). Entity warrants that it and its subcontractors comply fully with all applicable federal immigration laws and regulations that relate to their employees and their

4

compliance with A.R.S. § 23-214(A). A breach of the foregoing warranty will be deemed a material breach of this Agreement that is subject to penalties up to and including termination of the Agreement. ASU retains the legal right to inspect the papers of any contractor or subcontractor employee who works hereunder to ensure that the contractor or subcontractor is complying with the warranty stated above.

28. Tobacco-Free University.  ASU is tobacco-free. For details visit http://www.asu.edu/tobaccofree.

29. Authority.  If an individual or entity signs below on behalf of Speaker, such signatory represents and warrants that he/she/it has full and current authority to act and contract on behalf of Speaker and obligate Speaker, and that this Agreement is binding upon and enforceable against Speaker and the undersigned (if not Speaker) in accordance with its terms.

AGREED:

| PRINT NAME OF SPEAKER, OR AUTHORIZED AGENT ON BEHALF OF SPEAKER | ARIZONA BOARD OF REGENTS FOR AND ON BEHALF OF ARIZONA STATE UNIVERSITY |
|---|---|
| _____ Signature | _____ Signature |
| _____ Signatory Please Print Name | _____ Signatory Please Print Name |
| _____ Signatory Please Print Title | _____ Signatory Please Print Title |
| _____ Date Signed | _____ Date Signed |

5